**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO,<br>1625 L Street NW,<br>Washington, DC 20036,<br><br>*Plaintiff*,<br><br>v.<br><br>U.S. DEPARTMENT OF LABOR,<br>200 Constitution Avenue NW<br>Washington, DC 20210,<br><br>and<br><br>KEITH SONDERLING, in his official capacity as Acting Secretary of Labor,<br>200 Constitution Avenue NW<br>Washington, DC 20210,<br><br>*Defendants*. | Civil Action No. 26-3162 |

**COMPLAINT**

1. For more than ninety years, the federal government has provided important job-search and related services to job seekers across the country, administered by states through a grant-in-aid program referred to as the Employment Service (ES). Each year, the ES program provides more than ten million Americans with job search assistance, connecting workers and employers through a federally funded network of state public employment service offices throughout the country. ES offices are a vital part of the nation's workforce development system and provide job seekers with a variety of services, including access to job postings, resume assistance, and individualized counseling. ES offices also work with employers—listing job vacancies, providing referrals of qualified candidates, and providing labor market information.

2. The ES program as it now exists was established in 1933 via the Wagner-Peyser Act, currently codified at 29 U.S.C. §§ 49–49*l*-2. That statute was enacted to replace a preexisting disjointed, ineffective system that "had been hampered by the 'spoils system' and by the appointment of untrained workers."[1]

3. Throughout the subsequent ninety-plus years, the Department of Labor (DOL) has consistently interpreted the express authority delegated to it by the Wagner-Peyser Act to authorize the agency to condition funding on states' use of specific staffing models to deliver ES services. And consistent with the Act's purpose, DOL, for almost that entire period, has exercised that authority to require ES services be provided by state civil service workers employed on a merit basis. As DOL has explained, "the requirement to provide ES services using State merit staff … help[s] to allow the States to provide quality and consistent ES services in an accountable and transparent manner." DOL, Final rule, *Wagner-Peyser Act Staffing*, 88 Fed. Reg. 82658 (Nov. 24, 2023) (2023 Rule).

4. On August 20, 2026, DOL published a rule that, for the first time since 1933, adopts the position that the statute does not even *allow* DOL to require merit staffing. Based on DOL's legal conclusion that the "best reading" of the Wagner-Peyser Act provides no authority to impose merit staffing as a funding condition on states, DOL repealed the longstanding merit-staffing requirement. *See* DOL, Final rule, *Wagner-Peyser Act Employment Service Staffing*, 91 Fed. Reg. 54024 (Aug. 20, 2026) (2026 Rule).

5. The 2026 Rule adopts an incorrect reading of the Wagner-Peyser Act. Since 1933, the statute has granted DOL the authority to "develop[] and prescrib[e] minimum standards of

[1] Gladys L. Palmer, Committee on Economic Security, The History and Functioning of the United States Employment Service 430 (Nov. 1934), https://www.ssa.gov/history/reports/ces/cesbookapen4.html.

efficiency," while "promoting uniformity in … administrative and statistical procedure" for ES programs. Pub. L. No. 73-30, § 3(a), *codified at* 29 U.S.C. § 49b(a). The best reading of this provision is DOL's historical reading, which the agency adopted contemporaneously with the statute's enactment and which Congress has explicitly and implicitly ratified many times since. A personnel standard designed to ensure the uniform delivery of high-quality services is a "standard[] of efficiency" of the kind contemplated by the statute. The 2026 Rule is thus premised on an incorrect reading of the statute, and therefore not in accordance with law.

6. The 2026 Rule is also arbitrary and capricious. In promulgating the rule, DOL ignored Congress's own express and implied findings and its own prior factual findings as to the need for a merit-staffing requirement. DOL also failed to meaningfully respond to comments highlighting the benefits associated with merit staffing and concerns raised by replacing merit employees with non-merit staff—primarily, private contractors.

7. Given these flaws, Plaintiff American Federation of State, County and Municipal Employees, AFL-CIO (AFSCME)—a labor organization whose members include hard-working state merit-system ES employees in fifteen states who, due to the 2026 Rule, are now at risk of being displaced in favor of private contractors or non-merit employees and who have reduced bargaining power with their state employers now that the states have the option of outsourcing this work—brings this action asking the Court to declare the 2026 Rule unlawful and to vacate the Rule pursuant to section 706(2) of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2).

**JURISDICTION AND VENUE**

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, namely, the United States Constitution and the APA, 5 U.S.C. §§ 702, 706.

9. Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1) because Defendants are an officer and agency of the United States and reside in this district, and because Plaintiff AFSCME resides in this district.

## PARTIES

10. Plaintiff AFSCME is a membership association and labor union whose membership includes individuals employed by state and local ES agencies funded under Wagner-Peyser grants-in-aid in Alaska, Connecticut, Delaware, Hawaii, Illinois, Iowa, Louisiana, Maryland, Minnesota, Nebraska, New Mexico, New York, Ohio, Pennsylvania, and Washington. AFSCME is the certified collective bargaining representative of ES employees in each of these states pursuant to their respective state labor relations statutes, and exists for the purpose of preserving and improving the terms and conditions of these and other AFSCME-represented employees' employment. AFSCME pursues this goal through multiple venues and avenues, including the negotiation and enforcement of collective bargaining agreements setting terms and conditions of employment, legislative and policy advocacy, and representation in courts and administrative tribunals.

11. Defendant United States Department of Labor is an agency of the United States, headquartered in Washington, DC.

12. Defendant Keith Sonderling is the Acting Secretary of Labor and is sued in his official capacity.

## FACTUAL ALLEGATIONS

### A. The Wagner-Peyser Act

13. The predecessor to the current ES program was established in 1907 as the United States Employment Service (USES), housed within what was then known as the Department of Commerce and Labor, and largely focused on providing labor information to newly arrived

immigrants.[2] With the onset of World War I, the USES's mission and structure underwent several changes.[3] By the post-war period, the USES functioned only as a skeleton organization, particularly after President Harding issued Executive Order 3461, which allowed the entire civil service staff to be replaced with political appointees.[4]

14. By the onset of the Great Depression, most public employment offices were operated by states and municipalities—a system that was woefully inadequate for the massive increase in jobseekers. In 1931, the Department of Labor established USES offices across the country as part of a greater reorganization.[5] But the services provided at these offices were largely duplicative of, and not coordinated with, services provided by state and local government employment offices, or other specialized federal offices.[6] Further, the offices lacked trained and well-qualified personnel, as USES jobs were doled out via a "spoils system."[7]

15. "The inadequacy of the service rendered by the Federal organization, the waste engendered by two competing systems of public employment offices, and growing public interest in the problem" led to the introduction, and passage, of what became known as the Wagner-Peyser

---

[2] Palmer, *supra*, at 423–24.

[3] *Id.* at 424–28.

[4] *Id.* at 429.

[5] *See* "Labor: More Job Bureaus," *Time*, Apr. 27, 1931 https://time.com/archive/6747026/labor-more-job-bureaus/.

[6] Palmer, *supra*, at 430.

[7] *Id.*; *see also* W. Frank Persons, Federal-State Cooperation Under the Wagner-Peyser Act, Discussion of Labor Laws and Their Administration, 1934 Convention of the International Association of Government Labor Officials 142, 143 (1935), https://hdl.handle.net/2027/mdp.35112103499226 (noting "general agreement…that the standards of personnel, premises, and operating efficiency" were "far below the minimum required for the operation of genuine public effectiveness," due in part to the fact that "personnel were in all too many cases not free from political pressure").

Act in 1933.[8] That statute created a new USES as a bureau within DOL, and replaced the old dual-system of federal and state/local offices with a program for federal grants-in-aid to state employment systems, operating under federal uniform standards.

16. Section 3(a) of the Act directed the new USES to "assist in coordinating the public employment offices throughout the country and in increasing their usefulness by developing and prescribing minimum standards of efficiency, assisting them in meeting problems peculiar to their localities, promoting uniformity in their administrative and statistical procedure, furnishing and publishing information as to opportunities for employment and other information of value in the operation of the system, and maintaining a system for clearing labor between the several States." Pub. L. No. 73-30, § 3(a).

17. Since 1933, Congress has enacted several changes to the Wagner Peyser Act and to the ES system. None of these laws have narrowed DOL's authority to set minimum standards of efficiency under section 3(a) of Wagner-Peyser, and current law continues to charge DOL with "developing and prescribing minimum standards of efficiency" for state ES programs and "promoting uniformity in their administrative and statistical procedure." 29 U.S.C. § 49b(a).

**B. DOL's Consistent Understanding of its Section 3(a) Authority**

18. Until the 2026 Rule, DOL consistently understood section 3(a) as granting it the authority to require state ES offices to utilize particular staffing methods.

19. DOL first exercised its authority to set personnel standards for ES programs in the period immediately following the adoption of the Wagner-Peyser Act. In 1934, as explained by W. Frank Persons, then-Director of the USES, the agency had concluded that "personnel of the highest quality and of unquestioned political impartiality [we]re a prime requisite," and requiring

[8] Palmer, *supra*, at 430.

a "merit system of appointments" was "the most feasible means of assuring the selection of personnel who not only meet minimum standards, but who will be found to be the best qualified applicants available for the work."[9] In requiring such a system via its "personnel standards," Persons explained, the agency had "established with no thought in view other than that of bringing into the service individuals who could best assume the responsibilities placed upon them, and of keeping from the service individuals whose qualifications made effective performance of their duties questionable."[10]

20. DOL first issued regulations for the administration of ES programs in 1937. Those regulations set out five specific "minimum standards of efficiency," including

> Personnel of the State Service and all employees assigned for duty with the State employment service system shall be selected and shall hold office in accordance with the State Civil Service laws, or in accordance with the Merit System of the Federal Service.

DOL, *Rules and Regulations for the Administration of the Act of June 6, 1933, Providing for the Establishment of a National Employment System and for Cooperation with the Various States in the Promotion of Such System*, Rule 6(b), 2 Fed. Reg. 1175, 1175–76 (June 9, 1937). Revised regulations issued in 1938 maintained a functionally identical requirement. *See* USES, *Rules and Regulations Relating to the Cooperation of the U.S. Employment Service and States in Establishing and Maintaining a National System of Public Employment Offices*, § 7, 3 Fed. Reg. 1470, 1471 (June 22, 1938).

21. In 1946, DOL issued detailed "Standards for Merit System of Personnel Administration, State Employment Service Administration," which provided a much more detailed merit-staffing requirement for ES programs. 11 Fed. Reg. 13788 (Nov. 23, 1946). In so doing, the

---

[9] Persons, *supra*, at 146–47.

[10] *Id.* at 146.

Secretary noted that, since the enactment of Wagner-Peyser, the ES had "consistently" viewed "the maintenance of a sound system of personnel administration as an essential feature of proper administration of the Employment Service," and that Congress, through various laws, had "adopted the principle of personnel administration on a merit basis as an integral part of efficient administration." *Id.* at 13788.

22. In the decades that followed, Congress repeatedly acknowledged DOL's imposition of a merit-staffing requirement under the authority conferred by section 3(a) of the Wagner-Peyser Act. From 1947 through 1963, annual appropriations laws explicitly conditioned ES grants-in-aid on merit staffing. *See*, *e.g.*, P.L. No. 88-136, 77 Stat. 224, 226 (Oct. 11, 1963). Throughout that period, DOL enforced this requirement through various regulatory and subregulatory mechanisms. In 1963, three federal agencies jointly issued new merit-system standards that applied to grant-in-aid programs under a variety of statutes, including Wagner-Peyser, noting that such standards were necessary for "proper and efficient administration" of grant-in-aid programs. DOL, Dep't of Health, Educ., & Welfare, and DOD, *Standards for a Merit System of Personnel Administration*, 28 Fed. Reg. 734, 734–35 (Jan. 26, 1963).

23. In 1971, Congress enacted the Intergovernmental Personnel Act (IPA), Pub. L. No. 91-648, 84 Stat. 1909 (Jan. 5, 1971), which again acknowledged DOL's consistent exercise of its authority to require merit staffing in ES programs. The IPA contained a congressional finding that "the quality of public service at all levels of government can be improved by the development of systems of personnel administration consistent with … merit principles" and recognized the "national interest" "in a high caliber of public service in State and local governments" given that "numerous governmental activities administered by the State and local governments … are financed in part by Federal funds." *Id.* § 2, 84 Stat. 1909, *codified at* 42 U.S.C. § 4701. Section

208 of the IPA then transferred to the Civil Service Commission various agencies' "functions, powers, and duties [that] relate to the prescription of personnel standards on a merit basis," including the Secretary of Labor's authority under "the Act of June 6, 1933, as amended (29 U.S.C. 49 et seq.)"—i.e., Wagner-Peyser. *Id.* § 208(a), 84 Stat. 1915.

24. In 1978, Congress then enacted the Civil Service Reform Act (CSRA), which, among other things, abolished the Civil Service Commission and transferred its functions to other agencies. *See* Pub. L. No. 95-454, 92 Stat. 1111 (Oct. 13, 1978). In that law, Congress recognized and preserved the merit-staffing requirements for the ES program. The CSRA generally abolished "statutory personnel requirements established as a condition of the receipt of Federal grants-in-aid by State and local governments," *except* "requirements prescribed under laws and regulations" listed in section 208(a) of the IPA—which includes Wagner-Peyser. *Id.* § 602(a)(2), 92 Stat. 1189, *codified at* 42 U.S.C. § 4728(h). DOL thus continued to require merit staffing as a condition of ES grant-in-aid funds except where other models were authorized as part oflimited demonstration projects.

25. In 1997, DOL rejected Michigan's state plan on the ground that it failed to utilize merit-staffed or civil service employees in the provision of ES services. Michigan sued, arguing that the statute did not authorize a merit-staffing requirement. A district court rejected that challenge, holding that "the language in § 3a authorizing the Secretary to develop and prescribe 'minimum standards of efficiency' is broad enough to permit the Secretary of Labor to require merit staffing," and noting that, despite the "64 year history of requiring merit staffing … Congress has never explicitly rejected the merit staffing requirement." *Michigan v. Herman*, 81 F. Supp. 2d 840, 848 (W.D. Mich. 1998).

26. Just months after the decision in *Michigan v. Herman*, Congress enacted the Workforce Investment Act of 1998 (WIA), Pub. L. No. 105-220, 112 Stat. 936 (Aug. 7, 1998), which radically overhauled the nation's workforce development system. WIA made several changes to the Wagner-Peyser Act—but made no substantive changes to section 3(a) and the authority that section provided DOL. *Id.*, 112 Stat. at 1080–86, §§ 301–311.[11] When DOL amended its regulations to implement the WIA, it included the merit-staffing requirement, invoking its "legal authority to set staffing standards and requirements to ensure the effective delivery of services" pursuant to section 3(a) of Wagner-Peyser, as well as section 5(b) of Wagner-Peyser and the IPA. DOL, Interim Final Rule, *Workforce Investment Act*, 64 Fed. Reg. 18662, 18763 (Apr. 15, 1999) (discussing 20 C.F.R. § 652.15 (1999)). In response to comments received on its Interim Final Rule, DOL amended the regulation to make clearer that "Wagner-Peyser Act services must be delivered by merit-staff employees of a State agency," as opposed to merit-staff employees of local governments. DOL, Final Rule, Workforce Investment Act, 65 Fed. Reg. 49294, 49385 (Aug. 11, 2000). The agency explained that the requirement was necessary "to ensure consistency in the application of merit personnel systems and to promote greater administrative efficiency," and that it had "determined that State agency merit-staffing preserves and maintains competence, impartiality, and nonpartisanship in the administration of Wagner-Peyser Act services to job seekers and employers." *Id.* at 49385–86 (discussing 20 C.F.R. § 652.215 (2000)).

27. In 2014, Congress again reformed the workforce development system via the Workforce Innovation and Opportunity Act (WIOA), Pub. L. 113-128, 128 Stat. 1425 (July 22,

[11] The only change to section 3(a) was to replace the term "United States Employment Service" with the word "Secretary." 112 Stat. at 1080, § 391.

2014). And again, although Congress made changes to *other* parts of Wagner-Peyser, Congress did not alter DOL's authority to set standards under section 3(a). *See* WIOA Tit. III, §§ 301–08, 128 Stat. 1624–27. In its regulations implementing WIOA, DOL again included a merit-staffing requirement, noting that "the benefits of merit staffing in promoting greater consistency, efficiency, accountability, and transparency have been well established." DOL, Final Rule, *Workforce Innovation and Opportunity Act*, 81 Fed. Reg. 56072, 56267 (Aug. 19, 2016) (discussing 20 C.F.R. § 652.215 (2016)); *see also* DOL, Notice of proposed rulemaking, *Workforce Innovation and Opportunity Act*, 80 Fed. Reg. 20690, 20805 (Apr. 16, 2015) (explaining that merit-staffing requirement was justified "in order to ensure minimum standards for the quality of the services provided").

28. In 2020, for the first time outside of limited demonstration projects, DOL eliminated the longstanding merit-staffing requirement for ES programs. While doing so, though, DOL did *not* call into question the agency's statutory authority to impose such a requirement via section 3(a). *See* DOL, Final rule, *Wagner-Peyser Act Staffing Flexibility*, 85 Fed. Reg. 592 (Jan. 6, 2020). To the contrary, DOL stated that "the Department's imposition of a requirement that ES activities be provided by State merit staff was the Department's policy decision, and one that is permissible under the Act." *Id.* at 601. DOL made clear that it was eliminating that requirement not because the law required it to do so, but for "policy reasons." *Id.*

29. Three years later, DOL reinstated the merit-staffing requirement for all but the three states that had previously held limited waivers. 2023 Rule, 88 Fed. Reg. 82658, *codified at* 20 C.F.R. § 652.215. As it had in the 1998 Rule, DOL relied on its authority under sections 3(a) and 5(b)(2) of Wagner-Peyser and section 208 of the IPA. 88 Fed. Reg. at 82660–61. DOL provided three main justifications for reinstating the requirement. First, it explained that its experience

during the COVID-19 pandemic demonstrated it was necessary to ensure that ES workers could be cross-trained and step in to provide assistance in the administration of the Unemployment Insurance (UI) program—which, by statute, can only be done by merit-staff employees, while also noting the benefits of integrating UI and ES service delivery more generally. *Id.* at 82659–61, 82664, 82679, 82683–84. Second, DOL noted that "ES is a universal access program, and it is critical that it be administered by nonpartisan personnel held to transparent, objective standards designed to assure high-quality performance," and that "State merit-staffing requirement is a generally reliable method to ensure quality and consistency in delivery of ES services." *Id.* at 82661; *see id.* at 82673, 82674, 82683. Finally, DOL pointed to the lack of "evidence that alternative staffing models directly cause higher employment outcomes, balanced against widespread success in delivering services while maintaining State merit staff for ES." At the same time, DOL announced it would "further examine various staffing models and methods of delivering labor exchange services through a rigorous evaluation" of services provided in the three waiver states as compared to other states, in order "to determine whether such models are empirically supported." *Id.*[12]

**C. The 2025 Proposed Rule and Comments**

30. On July 1, 2025, DOL published a notice of proposed rulemaking, in which it proposed removing the requirement that states use state-employed merit staff to deliver ES services, as well as the requirement that the three waiver states participate in an evaluation of their service delivery, as set out in 20 C.F.R. § 652.215. *See* DOL, Proposed rule, *Wagner-Peyser Act*

[12] Although the 2023 Rule was effective January 23, 2024, it provided states until January 22, 2026, to comply. *See* 88 Fed. Reg. at 82658. DOL subsequently extended the compliance date to January 21, 2027. *See* DOL, Final rule, *Wagner-Peyser Act Staffing, Delay of Merit Staffing Compliance Date*, 91 Fed. Reg. 2486 (Jan. 21, 2026).

*Employment Service Staffing*, 90 Fed. Reg. 28239, 28240–41 (July 1, 2025). The sole justification that DOL provided was its assertion that "there is no statutory basis for the Department to require States to deliver ES services using only State merit staff." *Id.* at 28240.

31. Many organizations and individuals submitted comments in opposition to the proposed rule, including organizations like AFSCME that represent merit-staff employees and organizations that advocate on behalf of jobseekers who utilize ES services. These commenters explained that the proposed rule "would not only jeopardize the jobs of thousands of state merit-based ES employees but also threaten the integrity of the ES by leaving remaining staff vulnerable to political influence and corruption." Comments of AFL-CIO, ETA-2025-0005-0445. They also explained how the elimination of the merit-staffing requirement would decrease the quality of services provided, decrease programs' ability to root out fraud, and have particularly negative impacts on job-seekers that are veterans, migrant and seasonal farmworkers, and workers in rural areas. As one commenter put it, "The loss of a large cadre of unbiased state government staff would be detrimental to job seekers and employers across the country." AFL-CIO Comments. And as DOL had in its 2023 Rule, numerous commenters also explained how retaining merit-staffing requirement for ES would allow better integration between the delivery of UI and ES services, while also allowing states to remain better prepared for UI demand surges.

32. In its comments, AFSCME explained that the proposed rule rested on an erroneous interpretation of the Wagner-Peyser Act and that it failed to consider the purposes of that statute and Congress's repeated endorsement of a merit-staffing requirement. *See* Comments of AFSCME, ETA-2025-0005-0440. AFSCME's comment cited extensive research showing that using state merit staff promotes the effective, efficient, and impartial delivery of employment services and explained how allowing private entities or other non-state-merit staff to provide

employment services introduces motives and incentives that would interfere with the job referral process. AFSCME noted that experiences with the delivery of unemployment insurance during the COVID-19 pandemic—in which, under a temporary statutory change, states contracted with private companies that hired low-paid, poorly trained non-state-merit-staff—resulted in widespread errors and inefficiency. AFSCME also argued that DOL's economic analysis was flawed, as it underestimated the high costs of contracting out services.

33. Several commenters also explained why it made little sense to eliminate the merit-staffing requirement while the evaluation of the impacts of different staffing models announced in 2023 was still underway. DOL had contracted with Mathematica Policy Research to conduct that evaluation in 2024 and results were expected in 2029.

34. Several states and local workforce agencies submitted comments indicating that, should the proposed rule be adopted, they would cease using merit staff to provide ES services. *See*, *e.g.*, Comment of Ohio Department of Job & Family Services, ETA-2025-0005-0102; Comment of Massachusetts Workforce Ass'n, ETA-2025-0005-0444; Comment of Texas Workforce Commission, ETA-2025-0005-0437.

**D. The 2026 Final Rule**

35. On August 20, 2026, DOL issued the final rule, adopting the proposed rule and eliminating 20 C.F.R. § 652.215, effective October 19, 2026.

36. The preamble to the 2026 Rule did not dispute the three factual findings on which DOL had premised the 2023 Rule: (1) that "evidence that alternative staffing models directly cause higher employment outcomes" was lacking, (2) that there was "widespread success in delivering services while maintaining State merit staff for ES," and (3) that, as shown by the COVID-19 pandemic, there was a "need for ES state merit staff to be available for UI claims and appeals." 2023 Rule, 88 Fed. Reg. at 82664. As to the first finding, the preamble to the 2026 Rule did not

identify new evidence supporting use of alternative staffing models and did not acknowledge its prior conclusion that no such evidence existed. As to the second, the preamble did not suggest that the ES program was unsuccessful, and it did not acknowledge DOL's own prior recognition of the program's success. As to the third, the preamble did not address the need for ES state merit staff that could provide additional "surge capacity" for other services, because the agency concluded it lacked statutory authority to maintain a merit-staffing requirement. 2026 Rule, 91 Fed. Reg. at 54037.

37. As in the proposed rule, DOL's legal conclusion that "the best reading of the Wagner-Peyser Act is that there is no statutory basis for the Department to require States to deliver ES services using only State merit staff" remained its primary justification for the Rule. *Id.* at 54025. DOL interpreted section 3(a)'s express delegation of authority to "develop[] and prescrib[e] minimum standards of efficiency" as granting DOL the authority only "to prescribe performance and operational benchmarks governing the delivery of Employment Service activities." *Id.* at 54028. It asserted that "[a] staffing model is not itself 'a standard of efficiency.'" *Id.* at 54029.

38. DOL's new reading of the statute ignores that a patronage system of staffing was one of the primary problems Congress sought to address in reforming the Employment Service in the Wagner-Peyser Act. DOL's reading also cannot be reconciled with the contemporaneous understanding of the meaning of section 3(a), as reflected in the words of the ES's first director in 1934, and in the USES's first regulations, enacted in 1937, which explicitly included a merit-staffing requirement as one of five "minimum standards of efficiency." DOL's reading ignores that, over the ninety-two years in which DOL had consistently taken the position that section 3(a) *does* give DOL the authority to prescribe staffing requirements for ES programs, Congress had never amended section 3(a)—including when it altered other provisions of the Wagner-Peyser Act.

And DOL did not explain how its reading of the word "standards" as referring merely to benchmarks could be reconciled with Congress's later references to Wagner-Peyser as a statute that confers powers relating to the "prescription of personnel *standards* on a merit basis," IPA § 208(a), 84 Stat. 1915; CSRA § 602(a)(2), 42 U.S.C. § 4278(a). Instead, it simply stated the truism that section 208 of the IPA does not "contain an independent legal requirement for merit-staffing in the ES." 91 Fed. Reg. at 54025.

39. To the extent DOL provided other reasons for rejecting commenters' concerns about the proposed rule, DOL failed to engage in reasoned decisionmaking. For example, in response to comments that noted the "professionalism, impartiality, and accountability of merit staff, as well as their training, institutional knowledge, and deep community relationships," DOL stated these "qualities attributed to merit staff … are not exclusive to merit staff." 91 Fed. Reg. at 54032. DOL did not, however, meaningfully address commenters' arguments that, as the agency itself recognized in 2023, merit staff are *more likely* to have these qualities and, thus, that elimination of the rule would disserve the purposes of the Wagner-Peyser Act. Similarly, DOL's response to concerns that the use of non-merit staff would lead to higher turnover rates, decreasing the quality of services, was deficient. Without disputing the basic factual predicate, DOL asserted that, because the rule gave states latitude in designing staffing models, states could, if they chose to, "calibrate the compensation, training, career advancement opportunities, and organizational culture" so as to reduce turnover. 91 Fed. Reg. at 54042–43. DOL pointed to no reason to suggest that states *would* do so, though, and emphasized that it would not require states to take any such steps. Moreover, the possibility that states might take steps to address the harms caused by using non-merit-based staff does not meaningfully address comments that DOL should continue to address those harms itself as it had done for most of the statute's history.

40. DOL's response to commenters who raised detailed concerns associated with the use of private contractors similarly focused on the *possibility* that some of those concerns could be ameliorated with "proper oversight, transparent subaward mechanisms, and quality training." 91 Fed. Reg. at 54033. But DOL did not condition states' use of private contractors on "proper oversight, transparent subaward mechanisms, [or] quality training," much less specify what such oversight, award mechanisms, or trainings would look like. To the contrary, DOL emphasized that it would allow states broad discretion in deciding what "internal controls" they would institute "to ensure staff … provide high quality services to all customers." *Id.* at 54034.

41. DOL was dismissive of the wealth of evidence showing that the use of contract workers in the delivery of public benefits and services reduces the quality of service delivery, asserting that the numerous studies and research papers cited "do not reflect rigorous studies of ES nor ES staffing models." 91 Fed. Reg. at 54041. But DOL did not attempt to explain why the distinctions that DOL drew between the programs at issue in those studies and the ES program were meaningful. Nor did DOL point to any studies or research papers that reached different conclusions than those cited by commenters.

42. DOL also wrote off comments that highlighted problems that resulted from the temporary use of non-merit staff in providing unemployment insurance services during the COVID-19 pandemic, and how those problems highlighted fundamental issues with the use of non-merit staff. It simply stated that "pandemic-era circumstances were unprecedented," and thus refused to find the experience relevant "to more normal conditions." 91 Fed. Reg. at 54041.

43. Finally, DOL did not meaningfully engage with commenters who explained that the proposed rule would harm existing state merit staff, like AFSCME's members. Rather, it divorced itself from the predictable effects of the elimination of merit-staffing requirements,

saying that any decision to eliminate civil service jobs "rests with the State," and again pointing to its perceived lack of statutory authority. *Id.* at 54034. At the same time, for purposes of its cost-benefit analysis, DOL assumed that fifty percent of ES merit-staff employees would be replaced with non-merit-based workers. *Id.* at 54050.

**E. The Impact of the Rule on Plaintiff.**

44. Once the Rule goes into effect, states will be permitted by DOL to cease using state merit-system employees like members of Plaintiff AFSCME to provide ES services, and some states have already indicated that they will do so. As a result, AFSCME and its members will be harmed in a variety of related ways, as the Rule effectively introduces a new pool of competitors for jobs providing ES services without the protections and benefits of a state merit system. Where a state abandons its merit staffing model, it is likely that at least some current ES employees will lose their state jobs. Even if laid off ES employees are offered and accept employment by private contractors providing the outsourced services, they will no longer enjoy the protection of the state civil service system, their current public sector collective bargaining agreement, and their public sector benefits. Because ES employees are usually part of a larger bargaining unit of state employees in myriad positions—as is the case, for example, for AFSCME-represented ES workers in both Ohio and Delaware—if ES work is outsourced, the state employees who remain in the now-smaller residual bargaining unit of state employees will enjoy diminished bargaining strength in their own right, since bargaining strength is directly correlated to size. ES employees also sometimes assist with UI work or are in the same bargaining unit as UI workers, as is also the case for AFSCME-represented ES workers in Ohio and Delaware. For those AFSCME members whose jobs include services like UI determinations for which ES employees could otherwise provide surge capacity, the loss of their ES colleagues will be a significant harm to the remaining

employees' working conditions. And for any ES employee who loses their state job, AFSCME will suffer an injury in the form of a loss of dues from that ex-member.

45. Even in states that, for now, continue to utilize a merit-staffing model, the 2026 Rule provides states with a bargaining chip against AFSCME and its members in negotiations over future collective bargaining agreements—introducing the possibility that, should AFSCME and its members not agree with a given proposal, the state will simply stop using AFSCME members to provide these services at all. This decreases AFSCME's bargaining power and represents a competitive injury to individual AFSCME members.

46. Several states, including states in which AFSCME represents merit-system employees providing ES services, have indicated an intent and/or desire to use non-merit state employees moving forward.

47. For example, while the 2020 Rule (which allowed outsourcing) was in effect, DOL approved Delaware's plan to use non-merit contractual staff in the delivery of ES services. Delaware's draft plan for 2026–2028 indicates it would revert to using state merit staff (who are represented by AFSCME) only to comply with the 2023 Rule.[13] As the 2026 Rule rescinds the 2023 Rule, Delaware is likely to proceed with using contractual staff. This will harm the more than 200 employees in the bargaining unit represented by AFSCME Local 2038, 48 of whom are ES workers and others of whom are UI workers.

48. Other states submitted comments as part of the challenged rulemaking showing they are likely to move away from state merit-system employees. For example, the state of Ohio—in which ES employees are represented by AFSCME—submitted comments on the proposed rule

[13] Delaware WIOA State Plan Modification 2026-2028 Public Comment Draft, p. 326, https://laborfiles.delaware.gov/main/wdb/wioa/plan/2026/Delaware_PYs_2026-2028_DRAFT.pdf.

"applaud[ing]" the elimination of the merit staffing requirement, and the "flexibility" it would provide to state workforce agencies.[14] The Ohio Workforce Association, an organization of local workforce agencies, supported the proposed rule as well, suggesting that they would work with the State—which currently provides state merit employees to perform ES services for the local workforce agencies—to have non-merit employees and contractors take over the provision of ES services should the Rule be finalized.[15] This will harm Bargaining Unit 9 represented by AFSCME Ohio Civil Service Employees Association, which includes 51 ES positions as well as other UI worker positions.

## CLAIMS FOR RELIEF

## COUNT I

49. The APA directs courts to hold unlawful and set aside agency actions that are arbitrary, capricious, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

50. The 2026 Rule is a final agency action.

51. An agency action based on a flawed interpretation of a statute or regulation is not in accordance with law.

52. The 2026 Rule is based on an incorrect statutory interpretation—specifically, that the Wagner-Peyser Act does not grant DOL the authority to adopt a merit-staffing requirement as part of its authority to "develop and prescribe minimum standards of efficiency" and "promote uniformity in … administrative and statistical procedure," 29 U.S.C. § 49b.

53. Because the 2026 Rule is not in accordance with law, the Court should set it aside.

[14] Comment, Ohio Dep't of Job & Family Servs., ETA-2025-0005-0102.

[15] Comment, Ohio Workforce Ass'n, ETA-2025-0005-0042.

**COUNT II**

54. The APA directs courts to hold unlawful and set aside agency actions that are arbitrary or capricious. 5 U.S.C. § 706(2)(A).

55. The 2026 Rule is a final agency action.

56. A rule is arbitrary and capricious where the agency fails to "articulate a satisfactory explanation for its action including a rational explanation of the facts found the choice made." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). Where a rule "rests upon factual findings that contradict those which underlay its prior policy," the agency must also provide "a reasoned explanation … for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). And an agency "must respond in a reasoned manner to comments that raise significant problems or challenge a fundamental premise of its action." *Beyond Nuclear, Inc. v. U.S. Nuclear Regul. Comm'n*, 182 F.4th 977, 983 (D.C. Cir. 2026).

57. Because DOL failed to consider Congress's purpose in enacting the Wagner-Peyser Act, Congress's express recognition in the IPA of the connection between merit staffing and the efficient delivery of services, and Congress's repeated implicit and explicit endorsement of DOL's imposition of a merit staffing requirement over the last ninety-two years, the 2026 Rule was arbitrary and capricious.

58. The 2026 Rule represents a change in policy. In promulgating the 2026 Rule, DOL did not provide a reasoned explanation for disregarding facts and circumstances that underlay the 2023 Rule.

59. In promulgating the 2026 Rule, DOL failed to respond in a reasoned manner to comments that raised significant problems, including those pointing to evidence about the benefits of merit staffing and the dangers of non-merit staffing. DOL's repeated insistence that, despite a

lack of any regulatory requirements, states would mitigate the harms associated with shifting to a non-merit staff model, was irrational.

60. Because the 2026 Rule is arbitrary and capricious, the Court should set it aside.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff AFSCME prays that this Court:

(A) Declare the 2026 Rule arbitrary, capricious, and otherwise not in accordance with law;

(B) Set aside the 2026 Rule;

(C) Enjoin Defendants from implementing the 2026 Rule;

(D) Award Plaintiff its costs and expenses, including reasonable attorney's fees and expert witness fees; and

(E) Grant such other relief as this Court deems just and proper.

Dated: September 10, 2026

Respectfully submitted,

/s/ Adam R. Pulver
Adam R. Pulver (DC Bar No. 1020475)
Nandan M. Joshi (DC Bar No. 456750)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
apulver@citizen.org

/s/ Teague Paterson
Teague Paterson (DC Bar No. 144528)
Matthew Blumin (DC Bar No. 1007008)
Nick Serrano (DC Bar No. 1656078)
AFSCME
1625 L Street NW
Washington, DC 20063
(202) 775-5900
tpaterson@afscme.org
mblumin@afscme.org
nserrano@afscme.org

*Counsel for Plaintiff*